AMY M. SAMBERG (#013874)
**FORAN GLENNON PALANDECH**
**PONZI & RUDLOFF PC**
1 East Washington Street, Suite 500
Phoenix, Arizona 85004
Telephone: 602.777.6230
Email:      asamberg@fgppr.com

G. EDWARD RUDLOFF, JR. (Admitted *pro hac vice*)
EDWARD P. MURPHY (Admitted *pro hac vice*)
DIANNE J. MECONIS (Admitted *pro hac vice*)
**FORAN GLENNON PALANDECH**
**PONZI & RUDLOFF PC**
2000 Powell Street, Suite 900
Emeryville, CA  94608
Telephone:   (510) 740-1500
Facsimile:    (510) 740-1501
E-mail:       erudloff@fgppr.com
              emurphy@fgppr.com
              dmeconis@fgppr.com

Attorneys for Defendant THE TRAVELERS
INDEMNITY COMPANY

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| HARVEY PROPERTY MANAGEMENT COMPANY, INC., a Maryland Corporation; LYNWOOD LIMITED PARTNERSHIP T/A LYNWOOD APARTMENTS, an Arizona Limited Partnership; and VILLA DEL SOL LIMITED PARTNERSHIP T/A VILLA DEL SOL APARTMENTS, a Maryland Limited Partnership,<br><br>Plaintiffs,<br><br>v.<br><br>THE TRAVELERS INDEMNITY COMPANY, a Connecticut Corporation,<br><br>Defendant. | Case No.  2:12-cv-01536-SLG<br><br>**THE TRAVELERS INDEMNITY COMPANY'S NOTICE OF MOTION AND MOTION UNDER FED. R. CIV. P. 50(b) FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL PURSUANT TO FED. R. CIV. P. 59(a); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

**TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that The Travelers Indemnity Company ("Defendant" or "Travelers") hereby moves for Judgment as a Matter of Law, ("JMOL"), pursuant to the Federal Rules of Civil Procedure ("FRCP"), Rule 50(b), as to Plaintiffs Harvey Property Management Company, Inc., Lynwood Limited Partnership T/A Lynwood Apartments, and Villa Del Sol Limited Partnership T/A Villa Del Sol Apartments' ("Plaintiffs'") breach of contract claims, in full or, in the alternative, as to those portions of the breach of contract claims on which Plaintiffs failed to meet their burden of proof. Alternatively, Travelers moves for a new trial, pursuant to FRCP, Rule 59.

This motion is based on the Memorandum of Points & Authorities set forth below, the Declaration of Edward P. Murphy submitted herewith, the evidence adduced at trial and any evidence and argument that may be presented at the hearing on the motion.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### **I. INTRODUCTION**

The essential issue at trial was whether there was roof damage at the Villa Del Sol Apartments ("the Villa Del Sol") and/or the Lynwood Apartments ("the Lynwood") that was covered under the Commercial Property Policy issued by Travelers to Plaintiffs for the policy period January 1, 2010 – January 1, 2011 ("the policy") for which Travelers did not make payment and that would require the entire roofs to be replaced.

Plaintiffs have maintained, based on various theories, that an October 5, 2010 storm ("the storm") damaged all of the roofs beyond repair at both the Villa Del Sol and the Lynwood. At first, Plaintiffs' theory was that hail damaged the concrete roof tiles, such that all of the roofs had to be replaced. At trial, Plaintiffs' theory as to why the roofs needed to be replaced was that a layer of felt underneath the concrete roof field tiles – the underlayment - was "gouged" during the storm. According to Plaintiffs, the concrete roof field tiles were lifted in batches by the wind and then dropped back in place on the underlayment, causing gouges in the underlayment, which then led to leaks at the Villa Del

Sol some four years after the storm. It was the damaged underlayment that resulted in interior water leaks and that required the roofs to be replaced.

The evidence at trial, even when viewed in the light most favorable to Plaintiffs, does not support the jury's verdict that Travelers failed to pay for a covered loss to the roofs at the Villa Del Sol and/or the Lynwood. Thus, the Court should grant judgment as a matter of law for Travelers, notwithstanding the verdict. Alternatively, because the verdict is contrary to the great weight of the evidence, the Court should grant Travelers a new trial.

## II. STANDARDS TO BE APPLIED

### A. Standards Applicable To Rule 50(b) Motion

FRCP, Rule 50(b) provides, in part, as follows:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.[1] No later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:
>
>   (1) allow judgment on the verdict, if the jury returned a verdict;
>
>   (2) order a new trial; or
>
>   (3) direct the entry of judgment as a matter of law.

Under Rule 50, the Court may grant judgment as a matter of law in favor of the defendant when the record, as a whole, permits only one reasonable conclusion. See, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000) (standard for motion for judgment is the same as on motion for summary judgment); *Ostad v. Oregon Health Sci. Univ.*, 327 F.3d 876, 881 (9th Cir.2003) (judgment as a matter of law is proper when the evidence permits only one reasonable

---

[1] After Plaintiffs rested their case, on May 27, 2016, Travelers moved for judgment as a matter of law, pursuant to FRCP, Rule 50(a), on the grounds that Plaintiffs presented no evidence from which a reasonable jury could conclude that Travelers breached the policy. [Declaration of Edward P. Murphy ("Murphy Dec.", Exh. A, Trial Transcript ("TT," p. 1299, line 6-10.] The Court denied the motion without prejudice to a Rule 50(b) motion after the trial was concluded. [TT, p. 1318, line 20-23.]

-3-

conclusion, which is contrary to that reached by the jury).

The verdict "cannot be supported by only threadbare conclusory statements instead of significant probative evidence." *Lakeside-Scott v. Multnomah County*, 556 F.3d 797, 802 (9th Cir. 2009) (internal citation omitted); *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 545 (7th Cir. 1997) ("a mere scintilla is not enough" to sustain a verdict).

Judgments as a matter of law in jury trials may be entered with respect to less than an entire claim. 9B Fed. Prac. & Proc. Civ. § 2521 (3d ed.); *Hammond v. T.J. Litle & Co., Inc.*, 82 F.3d 1166, 1172 (1st Cir. 1996) ("A party may move for judgment as a matter of law on an issue by issue basis; it does not have to be all or nothing"); *Chesapeake Paper Products Co. v. Stone & Webster Engineering Corp.*, 51 F.3d 1229, 1236 (4th Cir. 1995) ("a party may appropriately move for judgment as a matter of law on discrete legal issues . . . because a party may seek such judgments with respect to issues that are not wholly dispositive of a claim or defense").

**B.      Standards Applicable To New Trial Motion**

Even where substantial evidence supports a jury's verdict, a new trial should be granted if the verdict is "contrary to the great weight of the evidence" or, in the sound discretion of the trial judge, the verdict would result in a miscarriage of justice. *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001); *Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1359 (9th Cir.1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). On a new trial motion, the Court may weigh the evidence and assess the credibility of witnesses, and need not view the evidence in a light most favorable to the moving party. *Landes Constr. Co. v. Royal Bank of Canada,* 833 F.2d 1365, 1371 (9th Cir.1987). If, having given full respect to the jury's findings and having reviewed all of the evidence, the judge is left with the definite and firm conviction that a mistake has been committed by the jury, a new trial should be granted. *Id.* at 1372.

**III.     ARGUMENT**

**A.      Plaintiffs' Burden To Show A Covered Loss**

The Properties were covered by a Commercial Property Policy (the "Policy") issued

by Travelers for the policy period January 1, 2010 – January 1, 2011.

The Policy provided, in relevant part, as follows:

### A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss.

**1. Covered Causes of Loss**

Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

Excluded in Section B., Exclusions; . . . .

The Policy provides, in part, as follows:

### G. ADDITIONAL CONDITIONS

The following conditions apply in addition to the Common Policy Conditions – Deluxe.

. . .

**8. Policy Period, Coverage Territory**

Under this Coverage Part:

We cover loss or damage commencing:

    (1) During the policy period shown in the Declarations; . . .

The insured bears the burden to establish coverage under an insuring clause. *Keggi v. Northbrook Prop. & Casualty Ins. Co.,* 199 Ariz 43, 46, 13 P.3d 785, 788 (App. 2000). Here, the insuring agreement, coupled with the policy period condition, requires Plaintiffs to show a direct physical loss of or damage to covered property, which commenced during the policy period.

Thus, Plaintiffs have the initial burden of showing that the roof damage began in the policy period, i.e., in this context - that the roof damage was caused by the storm. See e.g., *Liristis v. American Family Mut. Ins. Co.*, 204 Ariz. 140, 145-1456, 61 P.3d 22, 27-28 (Ariz. 2002) (Finding question of fact as to whether mold damage was caused by fire during the policy period; "If Plaintiffs cannot prove the causal connection [between mold

-5-

and a covered fire], then there will be no coverage.").

**B.     Requirement Of Proper Expert Testimony To Support Plaintiffs' Causation Theory**

Plaintiffs' theory that the roofs had to be replaced, rested on matters beyond the common experience of a lay witness. Thus, expert testimony was necessary to support Plaintiffs' theory. See e.g., *Johnson v. State Farm Fire & Cas. Co.*, 2013 WL 4607548 (S.D. Ala. August 29, 2013) ("a lay witness is not capable of testifying about whether roof damage arose due to a product defect, poor workmanship, natural wear and tear, storm damage, or some other cause."); *Ware v. Nationwide Ins. Co.*, 2013 WL 1680514 (N.D. Ala. 2013) ("While a lay witness may be able to recognize and testify about whether a roof is damaged, such a witness is not capable of reaching an informed conclusion about whether that damage arose due to a product defect, poor workmanship, natural wear and tear, storm damage, or some other cause."); *Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 665 (S.D. Fla. 2012) (most people do not possess the requisite specialized knowledge and training to determine damages to property most probably attributable to a hurricane); Fed.R.Evid. 701(c) (stating that lay witness opinion must not be based on scientific, technical, or specialized knowledge within the scope of Rule 702).

Federal Rule of Evidence 703 requires that an expert base an opinion on facts or data in the case that the expert has been made aware of or has personally observed. "An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record." *Tyger Constr. Co. v. Pensacola Constr. Co.,* 29 F.3d 137, 142 (4th Cir.1994). See also, *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 817 (9th Cir. 2014) (excluding expert testimony critiquing another expert where, among other things, the opinions were not based on facts or data known to the critiquing expert, and therefore the testimony was inadmissible under Federal Rule of Evidence 703).

C. **Judgment Should Be Entered In Favor Of Travelers As A Matter Of Law**

1. **The Verdict Is Unsupported As To The Villa Del Sol**

   a. **Plaintiffs' Theory Regarding Storm Damage To The Underlayment At The Villa Del Sol**

At trial, Plaintiffs' hypothesis was that the wind caused the roofs' field tiles to "chatter," i.e., the tiles lifted up and then fell back into place, causing the "lugs" on the underside of the concrete tiles to "gouge" the underlayment.[2] [TT p. 857, lines 6-25, p. 956, line 23 - p. 957, line 19.] According to Plaintiffs, the roof tiles would have to be removed to replace the underlayment, so the roof tiles would have to be replaced as well. [TT, p. 857, lines 22-25, p. 859, lines 1-5, p. 981, line 20 – p. 982, line 9.]

   b. **Wind Speeds Admittedly Were Not Sufficient To Uplift Field Tiles So As To Damage Underlayment**

According to Plaintiffs' expert, Mr. Robert Wright, a 71 mile per hour approach wind would be necessary to uplift the field tiles. [TT, pp. 887, lines 13-16, p. 888, lines 7-10, p. 992, lines 14-19.] However, Mr. Wright admitted that he had no meteorological backup to support 71 mile per hour winds at the Villa Del Sol. [TT, p. 891, lines 6-14, p. 892, lines 15-18.] The meteorological report on which Mr. Wright relied calculated the winds at the Villa Del Sol to be no more than 65 miles per hour when gusting.[3] [TT, p. 516, lines 13-25, p. 891, lines 6-14, p. 992, lines 20-24.] In fact, the actual wind speeds experienced at the Villa Del Sol Apartments may have been no more than 55 to 60 miles per hour as opined by Plaintiffs' expert meteorologist Rocco Calaci. [TT, p. 890, lines 9-16.][4]

---

[2] "Lugs" are concrete protrusions on the back of the concrete roof tile, which are used to hang the tiles over wooden battens. [TT, p. 744, lines 4-10, p. 1505, lines 2-6.]

[3] There was only a ten percent probability that the wind actually gusted to 65 miles per hour. [TT, p. 1248, line 22 – p. 1249, line 18.]

[4] There were no wind meters at the Villa Del Sol to say with certainty what the wind speed was. [TT, p. 1484, lines 9-13.]

-7-

### c. No Evidence Of The Actual Condition Of The Underlayment Before The Storm

Mr. Wright acknowledged that there was a "disconnect" between the 71 mile per hour wind speed he calculated as being necessary to cause an uplift of the field tiles and the meteorological data showing the winds gusting at no more than 65 miles per hour. [TT, p. 998, lines 12-25.] Despite the "disconnect," Mr. Wright stuck with his theory, because he saw actual bruising of the underlayment when he removed field tiles within a test square area. [TT, p. 998, lines 12-25.] However, Mr. Wright could only assume that the October 5, 2010 storm caused the bruising or gouging of the underlayment, because there was no evidence to show the condition of the underlayment on any of the roofs before the storm.

Prior to the storm, Plaintiffs' property manager, Mr. Jeff Harms, dissuaded anyone from going on the roofs. [TT p.344, lines 2-11, p. 344, lines 21 – p. 345, line 7, p. 390, line 21 – 391, line 4.] Mr. Harms replaced and repaired broken tiles from time to time as part of his efforts to maintain the roofs. [TT p. 312, lines 12-20.] When replacing broken tiles, Mr. Harms could view the underlayment, but did not pay any particular attention to its condition. [TT p. 384, lines 10-21, p. 385, lines 4-21.] Therefore, Mr. Harms could not speak to the condition of the underlayment before the storm. [TT p. 385, lines 4-21.] Further, there were no photographs or maintenance records for the roofs prior to the storm. [TT, p. 902, lines 3-9, p. 989, line 10-15, p. 1158, line 28 –p. 1159, line 6, p. 1181 line 20 –p. 1182, line 3.]

Mr. Wright, admitted that knowing the condition of the roofs before the storm was important to validate his theory:

> Q. Tell the jury, in gathering all the data, how was it important to know the condition of the roofs before the storm that you're looking at for this case?
>
> A. Well, it's important because it would give a baseline of what the roof was like before and after the particular storm event, that particular storm event caused the damage to the

-8-

particular building. So you want to know what the condition of the roof was before. [TT, p. 842, line 18-25]

Since Mr. Wright did not have any information regarding the condition of the underlayment at any time before the storm, his opinion that the underlayment was gouged during the October 5, 2010 storm is sheer speculation. Or to state it another way, even if the gouges to the underlayment were caused by tile uplift, as theorized by Mr. Wright, he could not connect that "damage" to the October 5, 2010 storm.

### d. No Evidence To Connect Condition of Underlayment To Roof Leaks

Plaintiffs' expert, Mr. Wright, hypothesized that the underlayment of the roofs was damaged, because there were numerous roof leaks reported at the Villa Del Sol during September, 2014 – nearly four years after the storm. [TT, p. 857, line 6-25, p. 859, lines 1-5.][5]

In an effort to validate his theory regarding the underlayment, Mr. Wright removed the concrete field tiles within various test squares at the Villa Del Sol, and examined the underlayment. [TT, p. 855, line 25 – 856, line 6.] While Mr. Wright found some gouges in the underlayment, he did not correlate the gouges with any occurrence of leaks, and did no testing to determine the effect the gouge may have on the area beneath it. [TT, p. 901, lines 11-15, p. 902, line 10-18, p. 902, line 25 - p. 903, line 4, p. 905, lines 5-8.]

It was undisputed that the felt underlayment was not a waterproof layer. [TT, p. 744, lines 14-25, p. 1470, lines 17-19.] The underlayment was water resistant, and its purpose was to catch incidental moisture. [TT, p. 661, line 6-16, p. 906, lines 3-14, p. 1469, line 19 – p. 1470, line 19.] The underlayment is nailed down when it is installed, so there are there are punctures to begin with. [TT, p. 745, lines 1-8.] Thus, the notion that tears in the underlayment required the replacement of the entire roof is an impermissible

---

[5] The storm itself did not result in any immediate leaks. [TT, p. 323, lines 14-20, p. 328, lines 15-21, p. 378, lines 13-17, p. 380, lines 12-14, p. 1148, lines 14-16.] There was no record of any leaks in the years after the storm until September, 2014. [TT, p. 489, lines 11-21, p. 1178, lines 10-14, p. 1181, lines 3-8.]

-9-

stretch.

### e. Other Evidence Inconsistent With Plaintiffs' Theory Of Damage To The Underlayment

Travelers' expert, Mr. DeLeon, testified that the theory that the field tiles were raised up by the wind and dropped back in the exact same place did not make sense. [TT, p. 1480, lines 9-24, p. 1481, lines 8-19, p. 1468, lines 3-18, p. 1476, line 16 – 1477, line 1.] Mr. DeLeon testified that the wind would have to lift the interlocking field tiles up between 2 to 6 inches for the tiles to be displaced and hit the underlayment.[6] [TT, p. 1477, lines 2-23.] If there was such an uplift, the tiles would be displaced, rotated or blown off the roof, which was not the case. [TT p. 1468, lines 19 – 1469, line 18.] There was no evidence at trial that any field tiles were displaced by the wind. [TT, p. 908, lines 22-23.][7]

Mr. DeLeon testified that the damage to the underlayment at the Villa Del Sol was not caused by the wind uplifting the concrete tiles. [TT, p. 1469, line 20 – p. 1470, line 18.] Mr. DeLeon testified that the bruising of the underlayment was likely caused by the installation of the concrete tiles (for example, workers stacking the tiles on the underlayment before installation). [TT, p. 1469, line 20 – p. 1470, line 18.]

### f. No Evidence Of Hail Damage Requiring Roofs To Be Replaced

Initially, the claim was that a number of the concrete roof tiles were damaged by hail. [TT, p. 491, lines 21-22.] Plaintiffs' engineering expert at trial, Mr. Wright, had no opinion as to whether hail required the roofs to be replaced. [TT, p. 951, lines 4-8.][8] Travelers' expert, Mr. DeLeon, testified that hail did not fracture any of the roof tiles at the

---

[6] Plaintiffs' expert agreed that the tiles would be lifted as much as six inches in order for the lugs on the tiles to damage the underlayment. [TT, p. 958, line 17 – p. 959:13.]

[7] Travelers paid for wind damage [TT, p. 1204, lines 7-17, p. 1206, lines 22-25.] to a number of the concrete tiles at the ridges (i.e., the peaks) [TT, p. 315, lines 11-15, p. 594, lines 14-19] and rakes (i.e., the edges) [TT, p. 742, lines 4-24, p. 769, lines 18-20, p. 770, lines 11-16].

[8] Mr. Wright did not do any study to determine the size of the hail that fell at the Villa Del Sol, but left that issue to meteorologists. [TT, p. 941, lines 12-17, p. 953, lines 7-12, p. 949, lines 13-16.] Mr. Henz, a meteorologist, testified that the hail at the Villa Del Sol was between 1 to 1.5 inches in diameter. [TT, p. 1242, line 24 – p. 1243, line 2.] Based on the physical evidence at the Villa Del Sol, Travelers' engineering expert, Mr. DeLeon, opined that the hail was less than one inch in diameter. [TT, p. 1425, lines 7 – p. 1426, line 3, p. 1427, lines 5-21.]

-10-

Villa Del Sol. [TT, p. 1430, lines 10-17, p. 1435, lines 13-20.] Thus, the only expert testimony is that hail from the storm did not damage the roofs at the Villa Del Sol, such that they had to be replaced. Even if it were accepted that some tiles were fractured from the hail from the October 5, 2010 storm, there is no evidence that this would have required the entire roofs to be replaced. Mr. Wright never expressed this opinion, and Travelers' expert, Mr. DeLeon, opined that hail from the October 5, 2010 storm was not large enough to fracture any tiles. [TT, p. 1425, line 18 – p. 1426, line 3, p. 1430, lines 10-17, p. 1435, lines 13-20.]

### g. **Plaintiffs Failed To Meet Their Burden Of Showing Unpaid Storm Damage To The Roofs At The Villa Del Sol**

In sum, the verdict as to Villa Del Sol rests on the theory that the roofs had to be replaced, because the underlayment was damaged. As discussed above, Mr. Wright calculated that winds of 71 miles per hour would be required to uplift the field tiles. However, Mr. Wright admitted that there was no meteorological evidence of winds over 65 miles per hour at the Villa Del Sol. [TT p. 892, lines 15-18.] In fact, there was evidence that the wind speeds could have been even less, i.e., only 55-60 miles per hour. [TT, p. 890, lines 9-16.] Thus, there is no support for Mr. Wright's conclusion that the field tiles "chattered," causing damage to the underlayment at the Villa Del Sol.

Further, there is no evidence as to the condition of the underlayment before the storm. Rather, Mr. Wright assumed that the underlayment had no flaws before the storm and that all of the gouging he observed when he inspected the underlayment in February, 2015 - over four years after the storm - was caused by the storm. [TT, p. 895, lines 10-16, p. 896, lines 6-8.]

In addition, Mr. Wright was unable to say that the gouges in the underlayment correlated with any leaking. Thus, the notion that the gouges to the underlayment required the entire roof to be replaced is speculative.

## 2. No Evidence To Support The Verdict As To The Lynwood

### a. No Evidence To Support Wind "Chatter" Theory At The Lynwood

Plaintiffs' expert, Mr. Wright, testified that his "chattering" theory could be applied to the Lynwood, just as he had applied it to the Villa Del Sol, because the Lynwood had roofs similar to those at the Villa Del Sol and the winds were higher at the Lynwood. [TT, p. 869, line 14 – p. 870, line 15.] However, Mr. Wright never inspected the Lynwood, and therefore could not say, for a fact, that any of the underlayment on the roofs at the Lynwood was gouged. [TT, p. 874, line 10 – p. 875, line 1.] Thus, even assuming that the field tiles could, in theory, have been lifted up by the wind during the storm, there is no evidence that any such uplifting caused damage to the underlayment, such that the roofs had to be displaced. No other evidence was presented as to the condition of the underlayment at the Lynwood either before or after the storm.[9]

Moreover, there was evidence introduced at trial from Plaintiffs' meteorologist that the wind speeds at the Lynwood were only 55 to 60 miles per hour. [TT, p. 890, lines 9-12.] These wind speeds – according to Mr. Wright's expert testimony - would not have been sufficient to have even caused the field tiles to uplift, let alone chatter.[10]

Mr. Wright testified that it was not his custom and practice to opine on a property he never inspected. [TT, p. 878, lines 12-24.] In fact, Mr. Wright testified that his opinions likely would be wrong if he did not review all the data to validate his theory:

> "If I don't look at all of the data that's available for the building, and if I don't look at the damages to the building and try to make opinions – an[d] I need to look at all of it; I need to look at the whole system – then my conclusions are going to be wrong."

[TT, p. 840, lines 7-11, see also TT, p. 843, lines 9-12.]

Mr. Wright further testified as follows:

---

[9] Plaintiffs sold the Lynwood in 2012. [TT, p. 1156, lines 23-24.]
[10] According to Travelers' expert meteorologist, the most likely wind gusts at the Lynwood were 65 miles per hour. [TT, p. 1244, lines 10-13.]

-12-

> You need to validate the data, and you validate it by actually getting on, in this particular case, the roofing system. And you look at particular areas, running like the tests that you do in a scientific method. And you -- you look at the whole system to see if the damages that you think occurred actually occurred. And you don't just go to one location; you look at multiple locations.
>
> [TT, p. 841, line 25 – p. 842, line 6.]

The only expert who inspected the Lynwood was Travelers' expert, Mr. Sitzmann. Mr. Sitzmann testified that he did not observe any field tiles displaced by wind, and his opinion was that wind did not damage any of the field tiles. [TT, p. 654, lines 12-16.] Further, there was no history of leaks at the Lynwood, which to Mr. Wright was an indicator of damage to the underlayment at the Villa Del Sol. [TT, p. 1181, lines 3-8.]

### b. No Evidence Of Hail Damage At The Lynwood

As noted above, Plaintiffs' expert, Mr. Wright had no opinion as to whether there was any hail damage that required the roofs to be replaced. [TT, p. 951, lines 4-8.] Mr. Sitzmann, the only trial expert to have inspected the roofs at the Lynwood, testified that no roof tiles were fractured by hail at the Lynwood. [TT, p. 592, lines 9-13, p. 598, line 16 – p. 599, line 3, p. 654, lines 6-9.][11]

### c. Judgment As A Matter Of Law Should Be Granted As To The Lynwood

In sum, Plaintiffs failed to offer sufficient evidence to support their theory that the roofs at the Lynwood required replacement, because the felt underlayment was damaged by field tiles "chattering." Mr. Wright did not personally observe any portion of the roofs at Lynwood. Further, there are no other facts in the case that were made known to Mr. Wright regarding the condition of the underlayment at the Lynwood. For example, there was no evidence of any interior water leaks at the Lynwood following the October 5, 2010

---

[11] Mr. Sitzmann testified that, based on the site evidence, the hail that impacted the buildings at the Lynwood was an inch and one quarter in diameter. [TT, p. 750, lines 12-19.] Mr. Henz, an expert meteorologist testified that the hail at the Lynwood was .75 to 1.25 inches in diameter. [TT, p. 1242, lines 15-19.] However, it would take hail of an inch and three quarters (golf ball size) to damage concrete tiles. [TT, p. 678, lines 17-21, p. 812, line 23 – p. 813, line 1.]

-13-

storm. Thus, Mr. Wright's opinion as to the Lynwood is based solely on the speculation that the conditions at Lynwood were the same as at Villa Del Sol. Just because the Lynwood and the Villa Del Sol had similar concrete tile roofs and were located within a mile of each other is not evidence of damage to the underlayment.

Because Mr. Wright relied only on speculation to support his conclusion that the underlayment at the Lynwood was damaged due to the storm, his testimony does not support the jury verdict as to the Lynwood. Accordingly, the Court should grant judgment for Travelers, as a matter of law, as to the Lynwood.

### D. Alternatively, A New Trial Should Be Granted, Because The Verdict Is Contrary To The Great Weight Of The Evidence

As discussed above, there was no legally sufficient evidence at trial to support the jury's verdict, and judgment should be granted in Travelers' favor as a matter of law. To the extent that the Court disagrees, a new trial should be granted, because, the verdict is contrary to the great weight of the evidence.

## IV. CONCLUSION

As set forth above, the Court should enter judgment, as a matter of law, in Travelers' favor. Alternatively, the Court should grant judgment, as a matter of law, as to those parts of Plaintiffs' claim as to which they did not sustain their burden of proof. To the extent that the Court concludes that there is sufficient evidence to support the verdict, the Court still can grant a new trial as the verdict is against the great weight of the evidence.

DATED: July 18, 2016

**FORAN GLENNON PALANDECH PONZI & RUDLOFF PC**

By: /s/ Amy M. Samberg
    Amy M. Samberg
    G. Edward Rudloff, Jr.
    Edward P. Murphy
Attorneys for Defendant THE TRAVELERS INDEMNITY COMPANY

-14-

**CERTIFICATE OF SERVICE**

**(Case No.: 2:12-cv-01536-SLG)**

I hereby certify that on July 18, 2016, I electronically transmitted the foregoing document and any attachments to the U.S. District Court Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Monica K. Lindstrom, Esq.
8300 North Hayden Road, Suite A207
Scottsdale, AZ  85258
Of Counsel Merlin Law Group, P.A.
Counsel for Plaintiffs

William F. Merlin, Jr., Esq.
Phillip N. Sanov, Esq.
Jean F. Niven, Esq.
Shane S. Smith, Esq.
Merlin Law Group P.A.
777 South Harbor Island Blvd., Suite 950
Tampa, FL  33602
Counsel for Plaintiffs

Michael N. Poli, Esq. (State Bar No. 006431)
Kesha A. Hodge, Esq. (State Bar No. 021824)
Merlin Law Group P.A.
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018
Counsel for Plaintiffs

/s/ Barbara Parker