**MONICA K. LINDSTROM**
ATTORNEY AT LAW
8300 N. Hayden Road, Suite A207
Scottsdale, Arizona 85258
Telephone: (480) 467-0380
Fax: (480) 467-0383
mklindstromlaw@gmail.com
State Bar No. 019109
*Of Counsel to Merlin Law Group, P.A., Counsel for Plaintiffs*

**MERLIN LAW GROUP, P.A.**
**William F. Merlin, Jr.** (Florida State Bar No. 364721)
**Phillip N. Sanov** (Texas State Bar. No. 17635950)
**Jean F. Niven** (Florida State Bar No. 407607)
**Shane S. Smith** (Florida State Bar No. 0053130)
777 S. Harbour Island Blvd., Suite 950
Tampa, Florida 33602
Telephone: (813) 229-1000
Fax: (813) 229-3692

**MERLIN LAW GROUP, P.A.**
**Michael N. Poli** (State Bar No. 006431)
MPoli@merlinlawgroup.com
**Kesha A. Hodge** (State Bar No. 021824)
KHodge@merlinlawgroup.com
2999 North 44th Street, Suite 520
Phoenix, Arizona 85018
Telephone: (480) 315-9980
*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| HARVEY PROPERTY MANAGEMENT COMPANY, INC., a Maryland corporation; LYNWOOD LIMITED PARTNERSHIP T/A LYNWOOD APARTMENTS, an Arizona limited partnership; and VILLA DEL SOL LIMITED PARTNERSHIP T/A VILLA DEL SOL APARTMENTS, a Maryland limited partnership,<br><br>Plaintiffs,<br><br>v.<br><br>THE TRAVELERS INDEMNITY COMPANY, a Connecticut corporation,<br><br>Defendant. | **CASE NO. 2:12-CV-01536-SLG**<br><br>**PLAINTIFFS' RESPONSE TO THE TRAVELERS INDEMNITY COMPANY'S NOTICE OF MOTION AND MOTION UNDER FED. R. CIV. P. 50(b) FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL PURSUANT TO FED. R. CIV. P. 59(a)** |

T1430104.DOC;1

Plaintiffs Harvey Property Management Company, Lynwood Apartments, and Villa Del Sol Apartments (collectively, "Plaintiffs") hereby respond to the Motion for Judgment as a Matter of Law or, in the alternative, a New Trial (the "Motion") (Dkt 549), filed by Defendant, The Travelers Indemnity Company ("Travelers"). As explained below, the verdict that the duly-empaneled jury rendered after seven days of testimony should not be overturned: "[A] decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his [or her] own doubts in the matter." *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).

## MEMORANDUM OF POINTS AND AUTHORITIES

### A. Travelers' Post-Trial Motion for Judgment as a Matter of Law is Limited to the Arguments Raised in its Pre-Verdict Motion.

A Rule 50(b) motion for judgment as a matter of law is not a freestanding motion, but, rather, is a renewed Rule 50(a) motion. *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). To move for judgment as a matter of law under Rule 50(a), a party must bring the motion before the case is submitted to the jury. *Id*. Only after the Court has denied or deferred ruling on a Rule 50(a) motion, and a jury subsequently returns a verdict against the moving party, may that party renew its motion by moving under Rule 50(b). *Id*. A party cannot "raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion." *Id*.[1]

Travelers' pre-verdict motion argued that (1) there was purportedly **no** evidence to show physical loss or damage to covered property (the roofs), (2) as to Villa Del Sol,

---

[1] *See also Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003) (*citing* Fed. R. Civ. P. 50 advisory committee's notes to the 1991 amendments) ("A post trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion."); *accord,* Fed. R. Civ. P. 50 advisory committee's notes to the 2006 amendments ("Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the pre-verdict motion.").

Plaintiffs' expert, Mr. Wright, did not opine about the damage from the hail, and the subject wind speed at Villa Del Sol was supposedly not fast enough to cause wind chatter, and (3) as to Lynwood, it was not inspected by Mr. Wright, and there was no evidence of damage or leaks. *See* **Exhibit 1**, Declaration of counsel, with excerpts from the Reporter's Transcript at Trial ("RT"), 1299-1302, 1314-15 (all numerical references are to pages of the transcript).

Yet Travelers now makes a series of new arguments in its Motion, at pages 8-11; namely, (1) there was no evidence of the pre-loss condition of the underlayment, (2) there was no evidence connecting the condition of the underlayment to the roof leaks, (3) the wind chatter idea made no sense because the tiles would not fall back into place, and (4) in a brand new contention, Travelers argues that even if the underlayment was gouged by wind chatter, this did not necessarily require the entire replacement of the roofs. Since these arguments were not made as part of the Rule 50(a) motion, it would be improper to consider them now.[2]

### B. Travelers' Motion Ignores One of the Key Arguments at Trial, to the Effect that Hail and Wind Caused the Thousands of Admitted Lower Right Corner Breaks.

Before turning to the arguments that Travelers actually preserved in its Rule 50(a) motion, it is critical to note that Plaintiffs' case proceeded to the jury on two related but independent theories: first, that the hail and wind caused the thousands of lower right corner breaks to the tiles that both sides admit were found after the storm; and second, that the wind was sufficiently strong to cause wind "chatter" and resulting damage to the underlayment.

---

[2] To the extent these arguments came up at all during the trial, there was either conflicting evidence, or the new contention is a "red herring" argument. For instance, Jeff Harms testified that after he discovered the storm damage, he repositioned the tiles. RT at 373, 394-95. As for the idea that Plaintiffs had to prove the pre-loss condition of the underlayment in order to recover, this is ridiculous; it would be a rare plaintiff indeed who has done destructive testing of roofs **before** an unexpected storm. Also, Plaintiffs were not required to show that the underlayment gouges caused the increased roof leaks, since (to quote the Policy) any storm-related damage to the underlayment (or to the tiles) constituted "direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss." *See* Trial Exhibit ("TE") 1, bates number 000958. Finally, there was evidence about increased roof leaks after the storm, RT at 328-29, 332-33, 402-03, and the jury can infer causation.

The jury's verdict can be supported on **either or both** of these theories. Yet Travelers' Motion is totally silent on the first theory. In fact, the Motion (Dkt 549, page 2, lines 21-26) incorrectly contends that Plaintiffs abandoned the first theory at trial. This is not accurate. *See* Plaintiff's Opening Statement, RT at 150 (after the storm, "Jeff [Harms] sees a sight like he has never seen before. Thousands of broken tiles. Missing Tiles. Hundreds of chips. Tiles with the right corner broken off."). *See also* Plaintiffs' Closing Argument, RT at 1746 ("Mr. Sitzmann did tell us that hail 2.43 inches can break those concrete tiles.") and pages 1752-53 (discussion of meteorology testimony by Mr. Henz about 2.43 inch hail over the properties). *See generally* Henz Cross-Examination, RT at 1265-66 (hail that hit the ground on the day of the storm could have been as large as 2.43 inches), and pages 1271-73 (Mr. Henz was impeached with his deposition testimony, where he testified that 2.43 inch hail fell over the "location," by which he meant the two apartment complexes at issue here, located just seven-tenths of a mile apart). *Cf.* the Special Verdict form submitted to the jury (Dkt 517), where the jury found that Travelers breached the policy by not paying for damage to the "field tiles," as well as the rake and ridge tiles (the verdict form was silent on the underlayment).

Travelers' Motion cannot be granted because (1) it ignores Plaintiffs' first theory of the case (that hail caused the thousands of lower right corner breaks), and (2) there was ample evidence in the record to support that theory (including from Travelers' expert, Mr. Henz).

### C. The Standard of Review for a Motion for Judgment as a Matter of Law is Very Restrictive.

In considering a motion for judgment as a matter of law, the Court must review all of the evidence in the record, view all of that evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in favor of the nonmoving party, and disregard all evidence favorable to the moving party that the jury is not required to believe; in doing so, the Court may not make credibility determinations or weigh the evidence.[3]

---

[3] *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097; *Castro v. County of Los Angeles*, 797 F.3d 654, 662-663 (9th Cir. 2015); *Go Daddy Software,*

Judgment as a matter of law is **only** appropriate where the evidence, construed in the light most favorable to the nonmoving party, permits just one reasonable conclusion (a conclusion contrary to that of the jury).[4] This standard means that a "jury's verdict must be upheld if it is supported by substantial evidence that is adequate to support the jury's findings, even if contrary findings are also possible." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014).[5]

### D.   There Was Ample Evidence To Establish a Covered Loss From the October 5, 2010 Storm.

"When reviewing the record as a whole, 'the court must draw all reasonable inferences in favor of the nonmoving party,' keeping in mind that "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.""" *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1005 (9th Cir. 2004) (*quoting Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).  In this case, there was ample evidence to establish that a covered loss occurred to both Villa Del Sol Apartments and Lynwood Apartments from the October 5, 2010 storm, and that the storm caused "direct physical damage" to the roofs (to quote the Policy, TE 1, bates number 000958).[6]

---

*supra*, 581 F.3d at 961; *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001).

[4] *Ostad v. Oregon Health Sciences Univ.*, 327 F.3d 876, 881 (9th Cir. 2003); *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002). This standard **requires** a Court to uphold "any jury verdict supported by substantial evidence" (substantial evidence is "evidence that a reasonable mind would accept as adequate to support a conclusion"). *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1366 (Fed. Cir. 2005).

[5] "Substantial evidence" is evidence sufficient to support the jury's conclusion, "even if it is also possible to draw a contrary conclusion from the same evidence." *S.E.C. v. Todd*, 642 F.3d 1207, 1215 (9th Cir. 2011). *See also Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1308 (Fed. Cir. 2010) (substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").

[6] "Generally, the insured bears the burden to establish coverage under an insuring clause, and the insurer bears the burden to establish the applicability of any exclusion." *Desert Ridge Resort LLC v. Occidental Fire & Cas. Co. of N. Carolina*, 141 F. Supp. 3d 962, 970 (D.

Travelers argues that causation can **only** be shown by expert testimony; but as this Court observed at the time of the Rule 50(a) motion, causation is not limited to expert testimony. RT at 1318-20 (page 1319, the Court: "But I see that the claim for hail and wind damage does not - - is not one that, at least under my understanding of Arizona law, certainly does not require expert testimony, and that the testimony of Mr. Harms as to the before and after of the roof condition would be sufficient . . . ."). Lay witness opinions are admissible if rationally based on the witness's perception, and when helpful to determining a fact in issue.[7]

The ability to observe the roofs before and after the storm, and to find that there were literally thousands of lower right corner breaks after the storm -- which were not there before the storm -- is proper lay testimony. *See* the testimony of Mr. Harms, RT at 313, 354-55, 391.[8] "The question of whether hail fell on a particular location on a particular day, and whether it

---

Ariz. 2015); *see also Keggi v. Northbrook Prop. & Cas. Co.*, 199 Ariz. 43, 46, 13 P.3d 785, 788 (App. 2000). In Arizona, as in most jurisdictions, an act or force need not be the **sole cause** of damage for causation to exist. *Koory v. Western Cas. & Sur. Co.*, 153 Ariz. 412, 414, 737 P.2d 388, 390 (1987); *Ontiveros v. Borak*, 136 Ariz. 500, 505, 667 P.2d 200, 205 (1983); *McDowell v. Davis*, 104 Ariz. 69, 72, 448 P.2d 869, 872 (1968). "Absent limiting language in the policy, therefore, [the insured] is entitled to recover if a 'windstorm' was the proximate cause of his loss, even 'though there may have been other contributing causes.'" *Koory, supra,* 153 Ariz. 412, 414, 737 P.2d 388, 390 (1987).

[7] *See, e.g., In re Groener v. Briehl*, 135 Ariz. 395, 398, 661 P.2d 659, 662 (App. 1983) ("The limitations on admitting opinion testimony from lay witnesses: [t]he opinions must be '(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.'").

[8] In the cases cited by Travelers, the Courts refused to allow the testimony of the respective witnesses because the witness neither qualified as an expert **nor had any firsthand knowledge**. *See, e.g., Johnson v. State Farm Fire & Cas. Co.*, 2013 WL 4607548, at *12 (S.D. Ala. Aug. 29, 2013) ("True, unlike the lay testimony presented in at least some of the cases discussed above, *contra Nix*, the lay testimony here is not based on observations looking far back in time. Still, the lay testimony is by witnesses who either personally spotted or repaired the leak after the fact."); *Ware v. Nationwide Ins. Co.*, 2013 WL 1680514, at *6–7 (N.D. Ala. Apr. 12, 2013) ("The Eleventh Circuit explained that the plaintiffs' witnesses did not observe the wall collapse or have personal knowledge of the construction, and therefore were inadmissible lay opinion testimony as to the cause. *Nix*, 444 Fed. App'x at 390. As such, the "uncontroverted evidence" from the insurance company's expert established that the claim was excluded from coverage. *Id*. As in *Nix*, Petty's testimony is not based on first hand knowledge, and therefore is not admissible as a lay witness's opinion.").

caused property damage, is **not** a matter solely within the scope of an expert's knowledge, and thus is not a matter that requires expert testimony; to the contrary, it is a matter of personal observation and common sense that is within the scope of lay testimony." *U.S. Fire Ins. Co. v. Lynd Co.*, 399 S.W.3d 206, 217 (Tex. App. 2012) (emphasis added).[9]

### *Lay Testimony from Debra Gallardo*

This trial began with the eyewitness testimony of Debra Gallardo, the property manager for both complexes. RT at 207-08, 212-13. She explained that the "hail looked like snow on the ground." *Id.* at 213. With respect to the impact of the hail on the roof tiles:

> Q. What color were the tiles on the roofs [at Villa Del Sol]?
>
> A. The tiles on the roofs are orange. And then when the hail and the wind, rain were hitting, they were -- it was just drives [*sic*] were all running orange. It was just eerie.

*Id.* Ms. Gallardo went to the Lynwood Apartments (less than a mile away) shortly after the storm and she told the jury about the state of those premises:

> By the time I got down there pretty much the same situation: tree branches everywhere; debris all over the property. There had been roof tiles that had fallen from roofs onto the property. And yeah, it was -- it looked like a war zone, is what it looked like.

*Id.* at 214. Among other points, her testimony about the orange water runoff certainly supports the concept that the hail caused actual damage to the orange roof tiles. *See DirecTV, Inc. v. Webb*, 545 F.3d 837, 844 (9th Cir. 2008) ("The law does not require direct evidence to support a factual finding. Circumstantial evidence may be sufficiently persuasive.").

### *Lay Testimony from Jeff Harms*

The jury also heard from Jeff Harms, the maintenance supervisor, who has been in the property maintenance and construction field for 42 years and has worked at the subject

---

[9] *See also Beech Aircraft Corp. v. U.S.*, 51 F.3d 834, 842 (9th Cir. 1995) ("Plaintiffs offered Drs. Shuy and McDermott to testify as to what could be heard in a tape recorded conversation, yet hearing is within the ability and experience of the trier of fact. It is our opinion that the trial judge, who sat without a jury, was in the best position to determine whether anything on the tapes could be heard which might need clarification by experts.").

properties for 29 years. RT at 299-301, 391. He testified that when he was on the roofs doing work prior to the October 5, 2010 storm, he did not notice any problems with the field tiles. *Id.* at 305. When shown photographs with hundreds of cracks in the tile, Mr. Harms described the pre-storm condition of the field tiles: "No, they were nothing like that. They were pristine. The field tiles were never a problem. I didn't have any cracks like that." *Id.* He also testified about the roof survey he conducted on the properties in 2000, when he evaluated every roof on both properties. *Id.* at 305-06. Mr. Harms testified about his pre-storm recollection of the field tiles:

> I only replaced, like -- **between the two properties**, I mostly did tarring around the vent pipes or checking them and checking the field tile. But **the field tile wasn't an issue**, but I -- that first time **I think I only replaced, between both properties, maybe 50**. End caps. But what I did was some -- some were kind of loose, so I renailed the end caps on some of them.

*Id.* at 307 (emphasis added).

In addition, Mr. Harms told the jury about his subsequent roof survey of all the roofs on both properties in 2006. RT at 308. He testified that the field tiles during the 2006 survey did not have the thousands of corner breaks noted after the 2010 storm. *Id.* at 310-11. Mr. Harms unequivocally testified that he did not observe thousands of broken right corner chips prior to the 2010 storm. *Id.* at 313, 354-55, 391.

Mr. Harms, who was at Villa Del Sol at the time of the 2010 storm, testified: "It was the biggest hail I've ever seen. . . . It hailed so much that the whole ground, it looked like snow." RT at 318-19, and 397-98 (discussing the "fierce" hail storm). He told the jury the hail storm was the "[m]ost severe storm I've been in in my life." *Id.* at 365. He described the hail as being large enough to plug a dry well, *id.* at 319, and he said that the most severe part of the storm "where [the wind] would blow you off your feet," lasted 15 to 30 minutes. *Id.* at 398.

A few hours after the storm, he went to Lynwood Apartments and looked around at the damage. *Id.* at 319. He described the damage there as follows:

> It was the same, but even worse by the office area, I remember that dramatically, because it took out two of our big, tall trees and took them all the way across the parking lot, and we couldn't even get them moved because they were huge. They were like 45- to 50-feet tall.

*Id.* at 320-21. It took weeks to clean up the aftermath of the storm (*id.* at 321) and rollaways were brought in to remove all of the debris. *Id.* at 321-22.

Mr. Harms testified that when he accompanied Jubilee, a roofing contractor, up on the roofs of Lynwood in the summer of 2011, he discovered "hundreds of broken tile on the roof." RT at 324-25, 363, 388, 390-91. It was not until then that he realized some of the ridge and rake tiles were actually moved or displaced by the wind. *Id.* at 363. *See also id.* at 394-95 ("I've never seen that before on the properties in all the years previous to the storm."). After he discovered the extent of the damage, he reported it to the property manager and the owners. *Id.* at 330. Both Ms. Gallardo and Mr. Harms also testified that, between the October 5, 2010 storm and the inspection with Jubilee in July of 2011, there was no significant weather event that could have made the roof damage worse. RT at 217-18, 233-34, 240, 393).

### ***Testimony of Edward Cespedes***

The jury heard the videotaped testimony of Edward Cespedes, Travelers' catastrophe adjuster. RT at 525-26. He inspected Lynwood on July 26, 2011, *id.* at 537-38, and he found extensive right corner chips on the tiles and "wind damaged tiles and ridges." *Id.* at 538. In this inspection, he found "some tiles there that were kind of displaced, possible wind damage." *Id.* at 538-39. He inspected Villa Del Sol the same day, noting, "The buildings were similar construction to the first complex and found the same type of damage to the roof tiles and the southwest elevations of all the 20 buildings on the premises." *Id.* at pages 540-41.

### ***Testimony of Expert John Henz***

As part of Plaintiffs' case-in-chief, the jury heard video clips from Travelers' meteorologist, John Henz. RT at 507. Regarding the subject storm, Mr. Henz opined:

> [T]he outflow boundary from this storm moved across both properties with southeast winds of 45 miles per hour with gusts to 65 miles per hour at the Villa Del Sol and 75 miles per hour at the Lynwood properties. The strongest winds would have lasted less than five minutes . . . . *Id.* at 516, 518.

Mr. Henz explained what he meant by a wind gust: "It's a reflection of the wind blowing at the location for a duration during a severe thunderstorm such as this one for a

period of anywhere from a number of seconds to possibly as long as two or three minutes." *Id.* at 517. He also stated, "I'm simply providing the wind speed and an estimate of how long it may or may not have lasted based on the observational evidence that I have." *Id.* at 517-18. Mr. Henz said he would defer to a structural engineer with respect to determining the wind force, wind gust factors, and their relationship to associated wind force in an event. *Id.* at 518.

Most critical of all, in his videotaped testimony, Mr. Henz reported the maximum hail size as 2.43 inches, and he clarified that this was meant to "**reflect what was going on at the Harvey Properties**, not with the whole storm itself." RT at 523 (emphasis added). Later, after Travelers decided to bring Mr. Henz as a live witness, his cross-examination decimated Travelers' positions (and its credibility). The cross-examination started with Henz admitting that he had offered brand new opinions during his direct examination. RT at 1251-60. On the critical issue of the hail being as large as 2.43 inches, he admitted the "2.43-inch hail is hail not just up in the atmosphere; it could actually be hail that hits the ground." *Id.* at 1265-66. His deposition testimony was then used to reiterate that hail as large as 2.43 inches fell over the "location," by which he meant the two apartment complexes at issue here, located just seven-tenths of a mile apart. *Id.* at 1271-73, including at page 1273, lines 7-10 ("A. That time when I referred to location, it was as specific as I could get, yes. It was for the two together. Q. The two [apartment] complexes that were seven-tenths of a mile apart. A. That's correct.").

### *Expert Testimony of Matthew Sitzmann*

The jury heard from Matthew Sitzmann, who inspected Lynwood on behalf of Travelers. RT at 590-92 (he was called as part of Plaintiffs' case-in-chief). He admitted that there were "thousands of fractured tiles, roof tiles, on the roofs" of the buildings he inspected (at Lynwood). *Id.* at 592. *See also id.* at 673, 656 ("the overwhelming majority" of the broken tiles had "lower right corner breaks").

Mr. Sitzmann agreed that a hailstorm is normally accompanied by wind, and it would be a rare hailstorm without wind. *Id.* at 671. He also admitted there was wind-driven hail

damage to the side of the buildings – *i.e.*, the wind was powerful enough to drive the hail into the sides of the buildings. *Id.* at 671-72. He found some wind-displaced rake tiles (*id.* at 673).

Returning to the issue of hail as large as 2.43 inches (an issue Travelers now **ignores**), Mr. Sitzmann admitted that hail of that size would break concrete tile. RT at 677-78. In fact, according to Mr. Sitzmann, the research from his firm, Haag Engineering, showed that hail as small as 1¾ inches can fracture concrete field tiles. *Id.*

Before moving on from Mr. Sitzmann, one further point illustrates the fact that the jury had ample reason to disbelieve Travelers' defenses. The fact is, Travelers' defenses suffered from "overreach." For instance, Sitzmann testified that while there were thousands of broken field tiles, **not a single one** was broken by wind or hail (RT at 654); and if he knew about the opinions of **the other Travelers expert, Mr. Henz** (75 mph wind gusts and hail up to 2.43 inches), he would still contend there was no hail/wind damage because **he would ignore Travelers' meteorological evidence** in favor of his site inspection (*id.* at 677-78).

### ***Expert Testimony of Robert Wright***

Plaintiffs presented their structural engineer, Robert Wright. RT at 826-28. He opined that there was severe damage to the roofing system -- which had two major components, the concrete tiles and the underlayment -- and the cause of the damage was the October 5, 2010 storm. *Id.* at 857-58. He also testified that the wind speeds needed to make the subject tiles lift and "chatter" was about 59 miles per hour. *Id.* at 845, 864, 882. *See also*:

> Q. Tell the jury how the relationship between wind speed and wind pressure helped you reach your conclusions in this case.
>
> A. Well, I used the same methodology that the Redland Technology people used. They put into a wind tunnel what speeds it would take to start lifting the tiles, and they used a methodology to -- to calibrate the approach winds, the winds that actually hit the roof, and the speed-up effect. And that's what I actually did in this -- this case. I took the particular tile, I calculated how much force by gravity it would hold itself down, and then I calculated, based on the Redland Technology methods, the speeds, based on the meteorological report of -- of what pressures would be on there and it starts chattering. And it -- the winds were high enough.
>
> Q. And based on this research, in your expert conclusion, to a reasonable

degree of engineering certainty, what wind speed was it that was required to make these roof tiles chatter?

A. Well, 59 miles an hour is -- caused chattering of the roof. *Id.* at 864. It "needed 51 miles an hour to start causing chattering, and 59 miles an hour to start causing chattering in Zone 2, so 51 and 59." *Id.* at 892. The reported wind speed at Lynwood was more than sufficient to cause chattering. As supported by Mr. Henz, Lynwood experienced wind gusts up to 75 miles per hour. RT at 516, 518.

In an attempt to undermine Mr. Wright's conclusions, Travelers focuses on the fact that the maximum wind speed reported by Mr. Henz at Villa Del Sol (65 mph) was less than the 71 mph Mr. Wright referenced in an earlier report. Mr. Wright explained the "disconnect":

> There was -- there was basically four waves of – of winds reported, four -- four waves of storms that were reported. The first wave came from my left hand, which was to the west, southwest, and then the fourth wave came from my right hand, which was from the southeast. And when they hit the building, they weren't slowed down.
>
> The other thing that is important to understand is those winds are called approach winds. They're approaching the building. **<u>When they hit the building, wind speeds up as it hits -- hits the roof of the building. And it speeds up quite a bit. 40 to a factor of 2. 40 percent to a -- you know, 1.4 to 2 times more</u>**. And it's like when it goes over an airplane wing.
>
> And that was one of the things in the Redland Technology report that they talked about was how wind speeds up when it hits the roof. And that's what happened is those wind speeds sped up and it caused the chattering to start, and that's a phenomenon that happens on every building. RT at 863.
>
> \* \* \*
>
> **<u>The approach winds can be much less, and they speed up when they hit the roof.</u>** That's the whole point of the Redland Technology report, that there's a difference between the winds as they approach the building, when they actually hit the building, it speeds up, like it's going over the top of an airplane wing. RT at 928 (all emphasis added).

So, although the reported wind speed was less, the **effective** wind speed was greater. In other words, even though the approach wind speed was less than 71 miles per hour when it hit the building, the wind then accelerated (increased) and caused the "chattering" of the roof tiles.

The tangible evidence that Mr. Wright observed at Villa Del Sol confirmed that chattering occurred. The roof leaks were not the only evidence of damage to underlayment.

The test squares taken from each building showed that the roof tiles lifted and fell, damaging the underlayment right where the "lugs" were located. Wright also opined to a reasonable degree of certainty that the conclusions reached at Villa Del Sol Apartments applied to Lynwood Apartments as well. RT at 869.[10]

Although Wright could not, of course, state with any certainty the precise movements or the precise flow of the wind chatter (because there were no eyewitnesses on the roofs to observe the movement of the tiles), his opinions are still relevant and pertinent evidence. *See Maffei v. Northern Ins. Co.*, 12 F.3d 892, 898 (9th Cir. 1993) (expert testimony is valuable where "[t]he circumstances [surrounding the accident] . . . were unwitnessed and thus required scientific deductions from circumstantial evidence"). Based on the evidence, Mr. Wright rendered an unequivocal opinion that the cause of the roof damage was the subject storm.

Travelers tries to portray this as speculative. But lack of total certainty is not, for a qualified expert, the same thing as guesswork. "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010); *see also Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056, 1059-1060 (9th Cir. 2003).[11]

---

[10] Travelers argues that Mr. Wright's conclusion as to Lynwood should not apply because he did not inspect Lynwood; but this contention is undermined by the fact that such deductive reasoning is acceptable in the engineering field. Indeed, Mr. Sitzmann testified about the protocol at Haag, which allows its engineers to reach opinions about damages to roofs that they have never inspected, by extrapolating. RT at 692. Also, these considerations just go to the **weight** that a jury could attribute to the evidence; the jury was still free to accept or reject the evidence. As evidenced by the jury verdict, the jury rejected Mr. Sitzmann's theory that the underlayment was damaged **30+ years earlier** during the installation.

[11] *See also Goebel v. Denver & Rio Grande Western R. Co.*, 346 F.3d 987, 991 (10th Cir. 2003) ("While expert opinions 'must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation, ... absolute certainty is not required.' 'The plaintiff need not prove that the expert is undisputably correct or that the expert's theory is "generally accepted" in the scientific community.' Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts that satisfy Rule 702's reliability requirements.") (citations omitted).

Traveler also ignores the fact that Mr. Wright testified he believes it was a **combination** of wind and hail that caused damage to the roof. RT at 872, 939. Further, the jury heard testimony that the lower right corners were the most vulnerable, because they were unprotected. *Id.* at 871. In summary, there was sufficient evidence from which the jury could determine that the October, 2010 storm caused damage to the roofs.

The crux of Travelers' argument can best be summarized as follows: the jury (and this Court) should have believed the Travelers' experts (or at least **one** of them, *i.e.,* Sitzmann rather than Henz) instead of Plaintiffs' expert. However, the "[a]uthority to determine the victor in such a 'battle of expert witnesses' is properly reposed in the jury." *Humetrix, Inc., v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001); *see also Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 235 F.3d 1184, 1192 (9th Cir. 2000) ("Weighing the credibility of conflicting expert witness testimony is the province of the jury.").

Obviously, there were factual disputes in this case, and "a factual dispute is best settled by a battle of the experts before the fact finder, not by judicial fiat. Where two credible experts disagree, it is the job of the fact finder, not the trial court, to determine which source is more credible and reliable." *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014). Here, the jury did exactly that.[12]

In considering a motion for judgment as a matter of law, the Court is to give deference to the jury's credibility findings, *Bilbrey by Bilbrey v. Brown*, 738 F.2d 1462, 1468 n. 8 (9th

---

[12] The jury certainly had legitimate reasons to question the primary Travelers expert, Sitzmann. For example, the jury was shown video clips where he repeatedly answered "I don't know" to questions that the jury could have reasonably concluded he should know the answer to, such as whether he received any accolades or rewards for being a good student at Iowa State (RT at 602-603), whether he graduated with honors when he received his graduate engineering degree from the University of Texas at Arlington (*id.* at 603), whether he received any designations for superior academic achievement while he was at the University of Texas (*id.*), whether he was a full time student at the University of Texas (*id.* at 604), the approximate year when he became a member of the Board of Directors at Haag Engineering (*id.* at 605-07), and how many years he sat on the Board at Haag (*id.* at 608); Mr. Sitzmann could not even recall whether he was under the care of physician (*id.* at 613-15).

Cir. 1984), and it "may not substitute its view of the evidence for that of the jury," *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001).

### E. The Motion for New Trial Should Be Denied As the Jury Verdict Was Not Contrary to the Clear Weight of the Evidence.

Under Rule 59(a), a trial court may grant a new trial, even though the verdict is supported by substantial evidence, if the verdict is contrary to the clear weight of the evidence, or is based upon evidence that is false, or to prevent a miscarriage of justice. [13]

Nonetheless, the Court must respect the jury's decision. The Seventh Amendment entitled both parties to a jury, *Buckles v. County*, 191 F.3d 1127, 1140 (9th Cir. 1999), and here, the parties exercised that right. "[A] decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter." *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987). Under Rule 59, the district court has "the duty . . . to weigh the evidence as [the Court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the Court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence." *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990) (omission and alterations in original). But, at the same time, "a district court may **not** grant a new trial simply because it would have arrived at a different verdict." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001) (emphasis added); *see also Tortu v. Las Vegas Metropolitan Police Dept.*, 556 F.3d 1075, 1084 (9th Cir. 2009). [14]

---

[13] *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014); *U.S. v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999); *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990); *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1372 (9th Cir. 1987).

[14] "Doubts about the correctness of the verdict are not sufficient grounds for a new trial: the trial court must have a firm conviction that the jury has made a mistake." *Tennant v. Peoria & Pekin Union Ry.*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944) ("Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results

As explained in *Duk v. MGM Grand Hotel*, 320 F.3d 1052, 1058-59 (9th Cir. 2003):

> **A trial court is rarely entitled to disregard jury verdicts that are supported by substantial evidence**. The Supreme Court has held that a trial court has a duty to attempt to harmonize seemingly inconsistent answers to special verdict interrogatories, "if it is possible under a fair reading of them." *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 119, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963). **A court may not disregard a jury's verdict and order a new trial until it "attempt[s] to reconcile the jury's findings, by exegesis if necessary.**" *Id.* "Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way." *Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962). To do otherwise "results in a collision with the Seventh Amendment." *Id.*; *see also Magnussen v. YAK, Inc.*, 73 F.3d 245, 246–47 (9th Cir. 1996). [Emphasis added.]

This is certainly not the rare case where the Court should disregard the jury verdict.

"[T]he burden of showing harmful error rests on the party seeking the new trial." *Malhiot v. S. Cal. Retail Clerks Union*, 735 F.2d 1133 (9th Cir. 1984). No such showing has been made by Travelers. In this case, the jury verdict demonstrates that Plaintiffs met their burden of proof by a preponderance of the evidence, by showing that a covered loss occurred. Although there were conflicting accounts presented, based on the record, and the verdict, this Court cannot say that the jury findings were clearly erroneous, nor can it determine which version or theory of recovery the jury believed, as there were no special interrogatories. *See Tortu v. Las Vegas Metropolitan Police Dept.*, 556 F.3d 1075, 1084 (9th Cir. 2009).

Per the jury verdict forms submitted by Travelers, the jury was asked to determine:

> 1. Did Plaintiffs prove by a preponderance of the evidence that Travelers breached the terms of the policy by failing to pay for damages to the field tiles at the Villa Del Sol apartment complex?
>
> 2. Did Plaintiffs prove by a preponderance of the evidence that Travelers breached the terms of the policy by failing to pay for damage to the rake and ridge tiles at the Villa Del Sol apartment complex?
>
> 3. Did Plaintiffs prove by a preponderance of the evidence that Travelers breached the terms of the policy by failing to pay for damage to the field tiles at the Lynwood Apartment complex?

are more reasonable.")

      4.    Did Plaintiffs prove by a preponderance of the evidence that Travelers breached the terms of the policy by failing to pay for damage to the ridge and rake tiles at the Lynwood Apartment complex?

All of which, the jury affirmatively found. RT at 1828-29. The jury's answers were not inconsistent or otherwise of such a nature as to warrant vacating the jury's verdict.

"The burden of showing something by a preponderance of the evidence . . . simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence." *Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.*, 508 U.S. 602, 622, 113 S.Ct. 2264, 2279, 124 L.Ed.2d 539 (1993). Here, there was sufficient evidence to support the jury's verdict.

## CONCLUSION

Given that ample evidence supports the jury's verdict, Plaintiffs respectfully request that this Court deny the Motion for Judgment as a Matter of Law or, in the alternative, a New Trial filed by Travelers.

DATED this 4th day of August 2016.

                    **MONICA K. LINDSTROM**

                    **-and-**

                    **MERLIN LAW GROUP, P.A.**

By */s/ Michael N. Poli*
    William F. Merlin, Jr.
    Phillip N. Sanov
    Shane S. Smith
    Michael N. Poli
    Kesha A. Hodge
    *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of August, 2016, I electronically transmitted the foregoing document and any attachments to the U.S. District Court Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Amy M. Samberg
Foran Glennon Palandech Ponzi & Rudloff PC
1 East Washington St., Ste. 500
Phoenix, AZ 85004
Attorneys for Defendant

G. Edward Rudloff, Jr.
Edward P. Murphy
Foran Glennon Palandech Ponzi & Rudloff PC
2000 Powell Street, Suite 900
Emeryville, CA 94608
Attorneys for Defendant


  */s/ Linda Lieber*
Z:\Clients\8181\000\PLE\T1427636.DOC